**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DENNIS DOMICO,** | : | **No. 3:12cv1449** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **VASILIOS KONTAS, ROCCO J.** | : | |
| **ARRUZZO, LISA J. ARRUZZO,** | : | |
| **THOMAS SCHNEIDER, DAVID A.** | : | |
| **WEINSTEIN and ARCHER &** | : | |
| **GREINER, P.C.** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18

U.S.C. §§ 1961-1968, Plaintiff Dennis Domico (hereinafter "plaintiff") brings

the instant action against his former business partners and their attorney.

Plaintiff's July 26, 2012 complaint alleges various frauds and deceptions

committed by defendants in an attempt to give the false impression that the

capital infused into their business–the Hollywood Diner and Sports Bar–was

greater than it was in reality.  In response to plaintiff's complaint, Defendant

David A. Weinstein (hereinafter "Weinstein") and Defendant Archer & Greiner,

P.C. filed a motion to dismiss pursuant to Federal Rules of Civil Procedure

9(b) and 12(b)(6).  (Doc. 9).  Defendant Vasilios Kontas (hereinafter "Kontas")

similarly responded to plaintiff's allegations with a Rule 12(b)(6) motion to

dismiss.  (Doc. 12).[1]  These motions are fully briefed and ripe for disposition.

**Background[2]**

Plaintiff alleges that he, along with various business lenders and government entities, fell pray to a sophisticated scheme perpetrated by defendants.  (Doc. 1, Compl. (hereinafter "Compl.") ¶ 1).  Plaintiff contends that defendants illegally elicited his support for their business venture after fraudulently gaining his trust by means of doctored bank statements, fraudulent invoices and altered bank check images.  (Id. ¶¶ 1-2).  The controversy at issue involves the development and operation of a diner located at 760 Airport Road, Hazle Township, Pennsylvania (hereinafter "the property").  (Id. ¶¶ 1, 12).  The well pled facts of the complaint, read in the light most favorable to the non-moving party, are as follows.

**Construction of the Diner in 2006-2007**

In October 2005, Defendants Rocco J. and Lisa J. Arruzzo (collectively "the Arruzzos") and Defendant Thomas Schneider (hereinafter "Schneider") purchased the property in the name of Arruzzo Enterprises, LLC.  (Id. ¶ 13).

_____

[1] Although they have been served, Defendants Rocco J. Arruzzo, Lisa J. Arruzzo and Thomas Schneider failed to enter an appearance in this action or otherwise respond to plaintiff's complaint.  As such, the Clerk of Court entered default against these defendants on September 12, 2012.  (Doc. 21).

[2] Because we address motions to dismiss pursuant to Rule 12(b)(6), we accept the plaintiff's allegations as true.

2

The Arruzzos and Schneider sought to build a diner at this location and, in conjunction with this effort, they obtained a liquor license.  (Id.)  At some point subsequent to the purchase of the land, Hollywood Diner & Sports Bar, LLC was created, and this new entity and Arruzzo Enterprises, LLC received financing from PNC Bank.  (Id. ¶ 14).

In 2006, the Arruzzos hired Kontas and/or his company, United Diner Construction, Inc., to build the diner.  (Id. ¶ 15).  Kontas in turn subcontracted with James Lagana (hereinafter "Lagana") to perform site work for the project.  (Id.)  In 2006, the exterior of the diner was built; however, the hollow diner sat empty for some time thereafter.  (Id. ¶ 16).  Subsequent to the completion of the exterior of the diner, Arruzzo Enterprises, LLC and the Hollywood Diner & Sports Bar, LLC defaulted on the PNC Bank loan.  (Id. ¶ 17).  Judgment was entered in the amount of $1.25 million against the debtors.  (Id.)

In 2007, the property was taken to a sheriff's sale by the Arruzzo's lender and judgment creditor.  (Id. ¶ 18).  This lender and judgment creditor placed the prevailing bid at the sheriff's sale, and the deed to the property was transferred to it on September 13, 2007.  (Id.)  In November 2007, the property was transferred to Lagana's company, Lagana Land Development, LLC.  (Id. ¶ 19).  The diner underwent renovations in 2008, after which it was 95% complete.  (Id.)

**Kontas and the Arruzzos Plot to Regain Control of the Property**

Kontas and the Arruzzos hatched a plot to regain control of the property, complete the construction of the diner and install the Arruzzos in management positions once the business opened. (Id. ¶ 20). Central to Kontas' plot was his deception of potential investors, lenders and government agencies. (See Compl. ¶¶ 25, 35). The Arruzzos, Schneider, Weinstein and various restaurant suppliers assisted Kontas in conning interested parties into believing that Kontas invested more that $500,000 in the diner venture. (See id.) Defendants allegedly tricked potential investors, lenders and government agencies by doctoring invoices, checks and bank statements.[3] (Id. ¶ 35).

---

[3] With respect to the aid each defendant provided Kontas in perpetrating this deception, plaintiff specifically alleges as follows:

> [T]he Arruzzos assisted in the altering of the Account documentation and invoicing in exchange for a side agreement with Kontas for a 33.3% interest in the business; R. Arruzzo assisted in the fake transfer of the liquor license via agreement of sale for the ownership interest; Schneider assisted in the fake invoicing in exchange for a side agreement with Kontas for an interest in the business and payment at closing; Weinstein and Archer & Greiner documented and organized the financing, including compiling the necessary documentation to show [lenders] a sufficient capital infusion, generating thousands of dollars in legal fees; and the alleged restaurant suppliers provided Kontas with fake and/or inflated invoices in exchange for the promise of a payment at any loan closing.

(Compl. ¶ 36).

In May 2009, Kontas launched this scheme when he directed Weinstein and his law firm, Defendant Archer & Greiner, P.C. (hereinafter "A&G"), to assist in the formation of Pennsylvania business entities to operate the diner and hold title to the property. (Id. ¶ 24). As such, Eastern Airport Hospitality, LLC (hereinafter "Eastern Hospitality") was formed on May 8, 2009 with the intent that it would own and wholly hold title to the property. (Id.; Doc. 9-1, Ex. 2, Domico's State Ct. Answer (hereinafter "State Ct. Answer") ¶ 12, 13).[4] Eastern Airport Kitchens, Inc. (hereinafter "Eastern Kitchens") was formed on May 28, 2009 with the intent that it would operate the business commonly known as the Hollywood Diner and Sports Bar (hereinafter "Hollywood Diner"). (Compl. ¶ 24; State Ct. Answer ¶ 13).

**Use of Fraudulent Documents to Gain Support for the Diner Venture**

Kontas used fraudulent documents to obtain plaintiff's support, to secure financing from BNB Bank / the United States Small Business

---

[4] For the purposes of the motions before the court, the court takes judicial notice of the admissions contained in the pleadings submitted to the Court of Common Pleas for Luzerne County with regard to the case of Kontas v. Domico, No. 3748-2011. All parties to this action agree that judicial notice of such undisputed facts from the state court action is appropriate. (Doc. 10, Br. in Supp. of Mot. to Dismiss A&G Defs. at 2 n.1; Doc. 15, Pl.'s Br. in Opp'n to Mot. to Dismiss A&G Defs. at 5 n.2; Doc. 23, Def. Vasilio Kontas' Br. in Supp. of Mot. to Dismiss at 3 n.1).

Administration (hereinafter "SBA"),[5] and Kontas attached fraudulent documentation to his application for financing with the Luzerne County Business Development Loan Program (hereinafter "NEPA Alliance").

With respect to plaintiff, the court notes that Kontas initially approached plaintiff to gauge his interest in completing the upholstery for the diner in 2006. (Compl. ¶ 22). Plaintiff never worked on the diner's upholstery in 2006, but, years later, Kontas identified plaintiff as a potential investor in the Hollywood Diner once the opportunity to purchase the property arose. (Id. ¶¶ 22-23). Kontas sought to bring on an additional investor because of the Arruzzo's "financial woes." (Id. ¶ 23). As is referenced above, Kontas attempted to convince plaintiff to invest in the diner by providing "proof" that his investment, through his business, United Diner Construction, Inc., exceeded $500,000. (Id. ¶ 25). Kontas committed this deception by providing plaintiff with various invoices, liquor license transfer documents and a bank statements. (Id.) In particular, around August 2009, Kontas supplied plaintiff with a doctored copy of United Diner Construction, Inc.'s Firstrust Bank

_____

[5] It appears from the allegations in the complaint that Kontas received a loan from BNB Bank that was guaranteed, at least in part, by the SBA. (See Compl. ¶ 29).

account statement from May 31, 2009 to June 30, 2009.[6]  (Id. ¶ 27; compare

Doc. 1-2, Ex. A, Doctored Bank Statement dated 6/30/2009, with Doc. 1-9,

Ex. H, Bank Statement dated 6/30/2009).

Kontas, with the aid of the Arruzzos, Weinstein and A&G, provided

similar "proof" of his investment in the diner to BNB Bank and the SBA to

assist in securing federally backed financing for Eastern Hospitality's

purchase of the property from Lagana.[7]  (Id. ¶ 29).  BNB Bank / the SBA

---

[6] Kontas represented to plaintiff that he made the following payments from the United Diner Construction, Inc. Firstrust Bank checking account:  (1) $309,000.00 to Artamus Restaurant Equipment for a partial payment of the balance owed on an invoice dated June 19, 2009 for kitchen equipment; (2) $6,100.51 to T. Schneider Company for a partial payment of the balance owed on an invoice dated June 25, 2009 for surveillance equipment; (3) $15,277.27 to Sam-Son Productions, Inc. for a partial payment of the balance owed on an invoice for audio/video equipment; (4) $70,000.00 to Artamus Restaurant Equipment for a partial payment of the balance owed on an invoice dated June 19, 2009 for the kitchen hood and fire system; (5) $25,000.00 to Action Sign Co., Inc. for a partial payment of the balance owed on an invoice dated June 22, 2009 for construction and installation of signage; (6) $41,412.19 to Library Resources for a partial payment of the balance owed on an invoice dated July 1, 2009 for furniture; (7) $35,000.00 to LiRoc for accounting services; and (8) $167,000.00 to Rocco J. Arruzzo for the transfer of the liquor license to Eastern Kitchens.  (Id. ¶ 26; Doc. 1-5, Ex. D, Altered Checks from Firstrust Bank).

[7] Specifically, Kontas attempted to bolster his loan application with BNB Bank / the SBA on four occasions.  First, in August 2009, Kontas provided BNB Bank / the SBA with an "invoice backup," which contained invoices from Artamus Restaurant Equipment, T. Schneider Company, Sam-Son Productions, Inc. Action Sign Co., Inc. And Library Resources.  (See Compl. ¶ 29; Doc. 1-3, Ex. B, Invoices).  Second, on August 19, 2009, Kontas faxed

7

approved Kontas' request for financing.  (Id. ¶ 40).  Subsequently, Rocco Arruzzo requested an additional $250,000 loan from BNB Bank to assist in financing the diner's startup, and, in this request, Arruzzo indicated that the diner had an initial cash infusion of $650,000 with an additional infusion of $150,000 to date.  (Id. ¶ 34; Doc. 1-8, Ex. G, Email from R. Arruzzo to BNB Bank dated 3/11/2010).

Defendants also provided doctored "proof" of Kontas' investment in the diner to the NEPA Alliance for the purpose of obtaining additional financing. (Compl. ¶ 31).  On February 18, 2010, Rocco Arruzzo sent the NEPA Alliance an email request for $200,000 in financing as startup capital for the operation of the diner.  (Id. ¶¶ 31-32; Doc. 1-7, Ex. F, Email dated 2/18/2010).  This financing request contained a representation of the investments made into the diner, including the alleged $167,000 purchase of the liquor license.  (Id. ¶ 32).  Moreover, in March 2010, Kontas and the Arruzzos submitted a

_____

BNB Bank / the SBA a copy of the doctored Firstrust Bank Statement dated June 30, 2009 as well as a copy of a receipt for $167,000 that Rocco Arruzzo signed as proof of payment for the liquor license.  (See Compl. ¶ 29; Doc. 1-4, Ex. C, Fax dated 8/19/2009).  Third, on September 9, 2009, Kontas faxed BNB Bank / the SBA copies of altered checks purporting to show payments reflected in the June 30, 2009 bank statement.  (See Compl. ¶ 29; Doc. 1-5, Ex. D, Altered Checks from Firstrust Bank).  Finally, on October 5, 2009, Kontas faxed BNB Bank / the SBA invoices allegedly reflecting the equipment purchased for the diner.  (See Compl. ¶ 29; Doc. 1-6, Ex. E, Equipment Invoices).

financing application to NEPA Alliance in which they provided a detailed accounting of capital infusions into the diner venture.  (Id. ¶ 33).

Despite defendants' representations to plaintiff, BNB Bank, the SBA, and the NEPA Alliance, none of the purported payments/investments as outlined above were ever made by Kontas or received by the restaurant suppliers.  (Id. ¶ 35).  Rather, Kontas, in concert with the other defendants, altered the Firstrust Bank account statement dated May 31, 2009 to June 30, 2009.  (Id.)  In addition to executing a bogus agreement of sale and doctoring the cashed check images, defendants altered and faked the invoices from Artamus Restaurant Equipment, T. Schneider Company, Sam-Son Productions, Inc., Action Sign Co., Inc. and Library Resources.  (Id.)

**Plaintiff's Investment and the Closing in the Lagana Deal**

Plaintiff agreed to invest in Eastern Hospitality and Eastern Kitchens because of Kontas' misrepresentations.  (Id. ¶ 37).  After plaintiff decided to invest in the venture, but prior to closing on the property, Kontas, in his capacity as sole director of Eastern Kitchens, executed a September 19, 2009 resolution in which he issued 1,000 shares of Eastern Kitchens stock to himself and 1,000 shares to plaintiff.  (State Ct. Answer ¶ 10).  Additionally, some time prior to the closing on the property deal with Lagana, plaintiff acquired a 50% interest in Eastern Hospitality.  (Id. ¶¶ 12-14).

On December 4, 2009, Eastern Hospitality closed on the purchase of the property from Lagana. (Id. ¶¶ 40-41). Plaintiff tendered $145,000 at the closing and BNB Bank extended a $2 million loan to Eastern Hospitality for the purchase of the property. (See id.; Doc. 1-11, Ex. J, Checks dated 12/4/2009). Both Kontas and plaintiff executed a note, mortgage and unlimited guaranty in favor of BNB Bank. (Compl. ¶ 40).

Even though Kontas had previously provided plaintiff and BNB Bank documentation that the liquor license had been purchased from Rocco Arruzzo in June 2009 for $167,000, Weinstein had nevertheless prepared a side-closing agreement between Lagana and Eastern Kitchens. (Id. ¶ 43). In this side-closing, Eastern Kitchens purchased the liquor license from Lagana for $50,000, $10,000 of which went to PNC Bank, $10,000 of which went to United Diner Construction Co. and $30,000 of which went to Lagana at closing. (Id.) Plaintiff questioned Weinstein regarding this side-closing agreement, but Weinstein did not address his concerns. (Id.) Plaintiff alleges that Weinstein's response evidences an attempt to conceal fraudulent cash infusions. (Id. ¶ 42). Weinstein and his law firm were involved with many aspects of the diner transaction,[8] and when plaintiff posed his question to

---

[8] Weinstein and A&G attorneys drafted the July 29, 2009 liquor license agreement of sale, helped Kontas develop a strategy for issues that could arise with the Lagana deal, and they held phone conversations with Kontas

Weinstein at the closing, plaintiff was under the impression that Weinstein and A&G represented his interests.  (Id. ¶ 38-39).

In addition to concealing the side-closing agreement, Kontas, with the aid of Weinstein and A&G, facilitated the payments to the alleged restaurant suppliers for the "remaining balance" on their inflated and/or false invoices. (Id. ¶ 44).  Moreover, Kontas entered into a secondary agreement with one or more of the restaurant suppliers, in which the suppliers agreed to partially "refund" funds dispensed at closing to Kontas for his personal use.  (Id. ¶ 45). If a vendor would not agree to this scheme, Kontas or Arruzzo fraudulently endorsed the check themselves. (Id. ¶ 46).

After the closing, plaintiff contacted Weinstein by telephone to ask additional questions regarding the side-closing involving the liquor license transfer.  (Id. ¶ 47).  Weinstein did not provide plaintiff with a clear answer, but plaintiff nonetheless accepted Weinstein's explanation.  (Id. ¶¶ 47-48, 50).

**Plaintiff Discovers Defendants' Fraud**

Unaware of any secret business arrangement between Kontas and the Arruzzos, plaintiff agreed with Kontas's suggestion to hire Rocco Arruzzo as the diner's manager and to hire Lisa Arruzzo as a diner employee.  (Id. ¶¶ 51-

_____

and potential lenders regarding the financing of the diner project.  (Compl. ¶ 39, Doc. 1-10, Ex. I, Archer & Greiner Invoice).

52).  The diner was scheduled to open on May 3, 2010.  (Id. ¶ 53).  In the

months prior to the diner's opening, plaintiff developed a working relationship

with the Arruzzos, and Rocco Arruzzo hired several members of plaintiff's

family as diner employees.  (Id.)

On April 9, 2010, Rocco Arruzzo told plaintiff that some of Kontas'

alleged investments in the business, such as the liquor license payment made

to the Arruzzos, were bogus.  (Id. ¶ 54).  Rocco Arruzzo stated that there

were two invoices from Artamus Restaurant Equipment, "one for the bank and

the real one."  (Id.)  Rocco Arruzzo confessed to plaintiff that he assisted

Weinstein and A&G in compiling fraudulent documentation.  (Id. ¶ 55).

On April 12, 2010, Weinstein emailed plaintiff about documenting the

loan Kontas made to Eastern Kitchens.  (Id. ¶ 56).  On April 13, 2010,

Weinstein sent plaintiff a draft promissory note in the amount of $350,000 for

Eastern Kitchen's execution in favor of Kontas.  (Id. ¶ 57; Doc. 1-13, Ex. L,

Email & Promissory Note).  The promissory note was prepared to offset the

difference between Kontas' investment in the business and that of plaintiff.

(Id. ¶ 57).  Plaintiff refused to sign the promissory note, and demanded

evidence to verify Kontas' investments.  (Id. ¶ 58).

Shortly after he rejected Weinstein's request to sign the promissory

note, plaintiff discovered two facsimiles sent from Kontas to Lisa Arruzzo on

July 22, 2009 and August 11, 2009.  (Id. ¶ 59).  These facsimiles purport to be United Diner Construction's bank information, which was sent to Lisa Arruzzo for her to alter in connection with Kontas' plot to defraud plaintiff, BNB Bank and the SBA.  (Id. ¶¶ 59-60; Doc. 1-14, Ex. M, United Diner Construction Fax; Doc. 1-15, Ex. N, United Diner Construction Fax).  After discovering this fraud, plaintiff withdrew the diner's application for financing from the NEPA Alliance.  (Id. ¶ 62).  Despite this obstacle, as well as Rocco Arruzzo's resignation the night before the scheduled opening, plaintiff nonetheless endeavored to make the Hollywood Diner a success.  (Id. ¶¶ 61-64).

### State Court Proceedings

On August 12, 2011, Kontas initiated a civil action against plaintiff, Eastern Kitchens and Eastern Hospitality in the Court of Common Pleas of Luzerne County, Pennsylvania.  (Doc. 9-1, Ex. 1, Verified Compl.).  Kontas' state court complaint contains the following nine counts:  (1) breach of fiduciary duty; (2) shareholder oppression; (3) breach of contract; (4) breach of implied covenant of good faith and fair dealing; (5) conversion; (6) violation of shareholder's rights of inspection; (7) breach of member's statutory duty; (8) dissolution of Eastern Kitchens; and (9) dissolution of Eastern Hospitality. (Id.)

On February 23, 2011, plaintiff filed an answer and counterclaims to

Kontas' state court complaint.  (See State Ct. Answer; Doc. 9-1, Ex 2, Domico's State Ct. New Matter & Countercl.).  Plaintiff's state court counterclaims allege the following five counts: (1) fraud; (2) breach of fiduciary duty; (3) conversion; (4) unjust enrichment; and (5) constructive trust.  (Doc. 9-1, Ex 2, Domico's State Ct. New Matter & Countercl.)  The parties have yet to notify the court of a final resolution in the state court proceedings.

### Federal Lawsuit

On July 26, 2012, plaintiff filed the instant action against Kontas, the Arruzzos, Schneider, Weinstein and A&G.  (Compl.).  Plaintiff's complaint charges defendants with two counts.  Count I alleges that defendants participated in an enterprise that engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  (Id. ¶ 65-73).  Count II contends that defendants conspired to violate the Racketeer Influenced and Corrupt Organizations Act in violation of 18 U.S.C. § 1962(d).  (Id. ¶ 74-78).  Kontas, Weinstein and A&G responded to plaintiff's complaint with motions to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Docs. 9, 12).  The parties briefed these motions, bringing this case to its current posture.

## Jurisdiction

Plaintiff asserts claims under the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961-1968.  The court has jurisdiction

pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall

have original jurisdiction of all actions arising under the Constitution, laws, or

treaties of the United States."

## Standard of Review

When a 12(b)(6) motion is filed, the sufficiency of the allegations in the

complaint are tested.  All well-pleaded allegations of the complaint must be

viewed as true and in the light most favorable to the non-movant to determine

whether, "'under any reasonable reading of the pleadings, the plaintiff may be

entitled to relief.'"  Colburn v. Upper Darby Twp., 838 F.2d 663, 665-66 (3d

Cir. 1988) (quoting Estate of Bailey by Oare v. Cnty. of York, 768 F.2d 503,

506 (3d Cir. 1985)).  The plaintiff must describe "'enough facts to raise a

reasonable expectation that discovery will reveal evidence of' [each]

necessary element" of the claims alleged in the complaint.  Phillips v. Cnty. of

Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 556 (2007)).  Moreover, the plaintiff must allege facts

that "justify moving the case beyond the pleadings to the next stage of

litigation."  Id. at 234-35.  In evaluating the sufficiency of a complaint the court

may also consider "matters of public record, orders, exhibits attached to the

complaint and items appearing in the record of the case."  Oshiver v. Levin,

Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (citations omitted).  The court does not have to accept legal conclusions or unwarranted factual inferences.  See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 133 (3d Cir. 2006) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)).

The federal rules require only that plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief," a standard which "does not require detailed factual allegations," but a plaintiff must make "a showing, rather than a blanket assertion, of entitlement to relief that rises above the speculative level."  McTernan v. N.Y.C., 564 F.3d 636, 646 (3d Cir. 2009) (citations and internal quotations omitted).  The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  Such "facial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  "[T]he factual detail in a complaint [cannot be] so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8."  Phillips, 515 F.3d at 232 (citation omitted).  "Though a complaint 'does not need detailed factual

allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" DelRio-Mocci v. Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (quoting Twombly, 550 U.S. at 555).

The Supreme Court has counseled that a court examining a motion to dismiss should, "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Next, the court should make a context-specific inquiry into the "factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." Id. at 681.

## Discussion

Defendants Kontas, Weinstein and A&G move to dismiss both counts of plaintiff's complaint. Count I of the complaint alleges that defendants participated in an enterprise that engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(c). Count II of the complaint alleges that defendants conspired to violate the RICO statute, in violation of 18 U.S.C. § 1962(d). We address plaintiff's two-count complaint *in seriatim*.

### A. Substantive RICO Claims

Count I of the complaint alleges that defendants participated in an enterprise that engaged in a pattern of racketeering activity in violation of 18

U.S.C. § 1962(c).  Although RICO is generally criminal in nature, it also provides for civil remedies.  As to a civil RICO action, "[a]ny person injured in his business or property by reason of a" RICO violation may recover, *inter alia*, treble damages.  18 U.S.C. § 1964(c).  Plaintiff has brought such a civil RICO action.  To state a civil claim under RICO,18 U.S.C. § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985).

A "pattern" must consist of at least two instances of racketeering activity.  18 U.S.C. § 1961(5).  These acts are commonly referred to as predicate acts.  The relevant predicate acts at issue in the instant case are wire, mail and bank fraud.  18 U.S.C. §§ 1341, 1343-1344.  Defendants argue that the predicate acts alleged by plaintiff are actionable as securities fraud.  Under the law, securities fraud cannot serve as a RICO predicate act.  Thus, plaintiff's RICO claim must be dismissed.  After careful consideration, we agree with defendants.

The civil remedies provision of RICO was amended in 1995 to narrow the kind of conduct that could qualify as a predicate act.  See Private Securities Litigation Reform Act ("PSLRA") of 1995, Pub. L. No. 104-67, 109 Stat. 737.  Specifically, section 107 of the PSLRA (hereinafter the "RICO

amendment") amended 18 U.S.C. § 1964(c) as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, **except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962**.

18 U.S.C. § 1964(c) (emphasis added).[9]  The Conference Committee Report accompanying section 107 states that the amendment was intended not simply "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "pleading other specified offenses

---

[9] The term "security" under the Securities Act of 1933 and the Securities Exchange Act of 1943 means:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement . . . investment contract . . . any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing . . . .

15 U.S.C. § 78c(a)(10); see also United Housing Found., Inc. v. Forman, 421 U.S. 837, 847 n.12 (1975) (finding the definition of a security is essentially the same for the Securities Act of 1934 and the Securities Act of 1933).

such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." H.R. REP. No. 104-369, at 47 (1995) (Conf. Rep.); see also Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3d Cir. 1999); Matthews v. Kidder, Peabody & Co., Inc., 161 F.3d 156, 157 (3d Cir. 1998). "A plaintiff cannot avoid the RICO amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." Bald Eagle, 189 F.3d at 330. Thus, the proper test is whether "the conduct pled as predicate offenses is actionable as securities fraud." Id.

In the present case, all predicate acts alleged in the complaint relate to plaintiff's investment in Eastern Kitchens–the corporation that operated Hollywood Diner. Specifically, Kontas fraudulently induced plaintiff into investing in the diner after gaining his trust by means of doctored bank statements, fraudulent invoices and altered bank check images. (Compl. ¶¶ 1-2, 25-29, 71-72). Based on these misrepresentations, plaintiff tendered $145,000 to Kontas on December 4, 2009. (Id. at 37, 40-41). In return, plaintiff received 1,000 shares of stock, or a 50% interest, in Eastern Kitchens. (State Ct. Answer ¶ 10, 14).

The Supreme Court has made abundantly clear that stock, whether in a

publicly held company or in a closely held corporation, constitutes a security governed by the federal security laws.  <u>Landreth Timber Co. v. Landreth</u>, 471 U.S. 681, 685 (1985); <u>see</u> <u>also</u> <u>Gould v. Ruefenacht</u>, 471 U.S. 701, 702-04 (1985) (finding the sale of 50% of the stock of a corporation is a securities transaction subject to the anti-fraud provisions of the securities Acts of 1933 and 1934).  Additionally, stock is expressly included in the definition of a security.  15 U.S.C. § 78c(a)(10).  Here, the conduct plaintiff alleges to be fraudulent, obtaining 1,000 shares of stock by means of Kontas' fraud and material misrepresentations, are directed at fraud in connection with the purchase or sale of securities.   Therefore, applying the <u>Bald Eagle</u> test, the court concludes that the conduct alleged as predicate acts by the plaintiff would be actionable as securities fraud and, consequently, may not serve as predicate acts for purpose of a civil RICO action.

Plaintiff attempts to avoid our conclusion in two ways.  First, plaintiff maintains that the Eastern Kitchens stock and his membership in Eastern Hospitality, a limited liability company, are not securities based on the economic realities underlying the business venture.  Second, plaintiff asserts that not all of the predicate acts constitute securities fraud.  We address plaintiff's arguments *in seriatim*.

21

First, plaintiff acknowledges that stock is generally considered to be a security, but he argues that whether his stock in Eastern Kitchens is a security turns on an examination of the economic reality underlying the business venture. Specifically, plaintiff claims his overall investment should be perceived as an "investment contract" and not as stock. As an investment contract, plaintiff would then have the court apply the three-part test outlined in the case of SEC v. W.J. Howey Co., 328 U.S. 293, 298 (1946),[10] to conclude that his investment is not a security.

Plaintiff's argument to apply the three-part test outlined in Howey is unpersuasive. The court does not need to delve into the economic realities of the transaction because the plaintiff received stock in a for-profit corporation. See Sulkow v. Crosstown, 807 F.2d 33, 37 (2d Cir. 1986) (holding that there is no need for resort to the economic realities test where . . . the transaction concerned stock in a for-profit corporation). Therefore,

---

[10] The United States Supreme Court has defined an investment contract as "a contract whereby (1) a person invests his money (2) in a common enterprise and (3) is led to expect profits from the efforts of the promoter or third party." SEC v. W.J. Howey Co., 328 U.S. 293, 298 (1946). The Supreme Court has endorsed relaxation of the requirement that an investor rely on others' efforts, by omitting the word "solely" from its restatement of the Howey test. See Int'l Bhd. of Teamsters v. Daniel, 439 U.S. 551, 561 (1979) (quoting United Housing Found., Inc. v. Forman, 421 U.S. 837, 852 n.16 (1975).

plaintiff's stock in Eastern Kitchens is a security and the conduct alleged as predicate acts by plaintiff would be actionable as securities fraud.[11]

Second, plaintiff argues that not all of the predicate acts constitute securities fraud.  Plaintiff asserts that if only some of the conduct alleged is securities fraud, then some other portion of the conduct is not actionable as securities fraud.  And it is this "other portion" of defendants' conduct that constitutes the predicate offenses of mail, wire and bank fraud.

Plaintiff submits that the "other portion" of the conduct consisted of the Arruzzos, Schneider, Arruzzo Enterprises, LLC, and the Hollywood Diner & Sports Bar, LLC committing bank fraud.  Additionally, the "other portion" relates to the defendants attempting to defraud Luzerne County for additional financing.  Finally, plaintiff alleges the interests in the business venture to the

_____

[11] Even if the court were to delve into the economic realities, we would still find that the RICO amendment precludes plaintiff's claims.  The economic realities reveal plaintiff received 1,000 shares of stock in Eastern Kitchens (a corporation) and a 50% ownership interest in Eastern Hospitality (an LLC) in exchange for a $145,000 capital infusion.  The parties intended the corporation would operate the diner and the LLC to hold title to the property. (State Ct. Answer ¶ 13).  Plaintiff contends his ownership interest in the LLC is not a security because it does not meet the definition of an "investment contract."  Specifically, plaintiff argues he was not a passive investor because "he and his wife worked 70-hour weeks trying to launch a successful diner . . . ."  (Compl. ¶¶ 2, 53, 61-64).  An analysis of the economic realities, however, reveals plaintiff was an active participant in the corporation, Eastern Kitchens, and not the LLC.  See Howey, 328 U.S. 293 at 299.

Arruzzos and Schneider and the generation of thousands of dollars in legal fees to A&G occurred separately and distinctly from inducing plaintiff's investment.

We find plaintiff's argument unpersuasive because plaintiff alleges that defendants' actions were part of a single fraudulent scheme. The single fraudulent scheme was to dupe plaintiff into purchasing securities in Hollywood Diner. The RICO amendment removed securities fraud as a predicate offense in civil RICO actions. Section 10(b) of the SECURITIES EXCHANGE ACTS of 1934, 15 U.S.C. § 78j(b)[12] and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5[13] are directed at fraud "in connection with the purchase or sale"

---

[12]Section 10(b) of the Securities Exchange Act of 1934 states:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

[13]The SEC promulgated Rule 10b–5 that states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit

of securities.  <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 733

(1975).  Plaintiff cannot avoid the RICO amendment's prohibition by pleading

mail fraud, wire fraud and bank fraud as predicate offenses in a RICO action

if the conduct giving rise to those predicate offenses would be actionable as

securities fraud.  <u>See</u> <u>Zanford</u>, 533 U.S. at 820; <u>Bald Eagle</u>, 189 F.3d 321 at

330.

In sum, the court finds that the predicate acts alleged by plaintiff are

actionable as securities fraud.  The RICO amendment precludes plaintiff from

pleading securities fraud as predicate acts.  Thus, plaintiff's substantive

RICO claims under 18 U.S.C. § 1962(c) fail as a matter of law.

## B.  RICO Conspiracy Claims

Count II of the complaint alleges that defendants conspired to violate

the RICO statute, in violation of 18 U.S.C. § 1962(d).  To state a RICO

conspiracy claim, plaintiff must allege "(1) an agreement to commit the

---

to state a material fact necessary in order to make the
statements made, in the light of the circumstances under which
they were made, not misleading, or

(c) To engage in any act, practice, or course of business which
operates or would operate as a fraud or deceit upon any
person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

predicate act and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate one of the substantive provisions of the RICO statute.  Mega Concrete, Inc. v. Smith, No. 09-4234, 2011 WL 1103831, at *13 (E.D. Pa. Mar. 24, 1989)).

Although a defendant, in certain circumstances, may be held liable under § 1962(d) when his own actions do not amount to a substantive RICO violation, the Third Circuit has held that "a § 1962(d) claim must be dismissed if the complaint does not adequately allege 'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense.'"  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 373 (3d Cir. 2010) (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)); see also Magnum v. Archdiocese of Phila., 253 F. App'x 224, 229 (3d Cir. 2007) ("'[a]ny claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.'" (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1192 (3d Cir. 1993))).

In the instant case, Count II of the complaint fails as a matter of law.  As the court explained above, plaintiff has failed to state a claim for a substantive violation of the RICO statute.  As such, plaintiff's RICO conspiracy charge is

26

not legally viable.

## Conclusion

For the stated reasons, we find plaintiff has failed to state a claim for a substantive violation of the RICO statute. The predicate acts alleged by plaintiff would be actionable as securities fraud and, consequently, may not serve as predicate acts for purpose of a civil RICO action. Because plaintiff has not adequately alleged a substantive RICO violation, the RICO conspiracy claim also fails. Accordingly, the defendants' motions to dismiss will be granted, and plaintiff's complaint will be dismissed. An appropriate order follows.[14]

---

[14]As we have found that plaintiff's complaint fails as a matter of law, we will strike the entry of default (Doc. 21) against Defendants Rocco J. Arruzzo, Lisa Arruzzo and Thomas Schneider.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DENNIS DOMICO,** | : | **No. 3:12cv1449** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **VASILIOS KONTAS, ROCCO J.** | : | |
| **ARRUZZO, LISA J. ARRUZZO,** | : | |
| **THOMAS SCHNEIDER, DAVID A.** | : | |
| **WEINSTEIN and ARCHER &** | : | |
| **GREINER, P.C.** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 26th day of March 2013, Defendants Kontas, Weinstein and A&G's motions to dismiss (Docs. 9, 12) are hereby **GRANTED**. The Clerk of Court is directed to strike the entry of default (Doc. 21) against Defendants Rocco J. Arruzzo, Lisa Arruzzo and Thomas Schneider and close this case.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**

28